**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| JESSICA MARCANTEL, individually and on behalf of all others similarly situated, | Case No._____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| WEBTPA EMPLOYER SERVICES, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Jessica Marcantel ("Plaintiff"), by and through her undersigned counsel, hereby files this Class Action Complaint individually and on behalf of all others similarly situated against Defendant WebTPA Employer Services, LLC ("Defendant" or "WebTPA"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and her own personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this action against WebTPA for its failure to properly secure and safeguard her own and nearly 2.5 million individuals' highly valuable and protected personally identifiable information including, *inter alia*, names, contact information, dates of birth, dates of death, Social Security numbers, and insurance information (collectively, "PII"), and failure to comply with industry standards to protect information systems that contain customer PII.

2.      Businesses that handle PII owe a duty to the individuals to whom that data relates. This duty to protect PII arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the affected individuals.

1

3.      WebTPA is a third-party administrator that provides customized administrative services to health plans and insurance companies.

4.      In order to provide its services, WebTPA has access to its client insurance companies' customers' PII. As WebTPA is or should have been aware, this type of personal and sensitive data is highly targeted by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to the Plaintiff and Class Members.

5.      In turn, WebTPA has a duty to secure, maintain, protect, and safeguard the PII with which it has been entrusted against unauthorized access and disclosure through reasonable and adequate data security measures.

6.      Despite WebTPA's duty to safeguard PII, Plaintiff's and Class Members' sensitive information was exposed to unauthorized third parties during a massive data breach that occurred between April 18 and April 23, 2023 (the "Data Breach").[1]

7.      Based on the public statements of WebTPA to date, nearly 2.5 million individuals' PII—including, *inter alia*, their names, contact information, dates of birth, Social Security Numbers, and insurance information—was viewed and possibly exfiltrated by cybercriminals during the Data Breach.[2]

---

[1] *Notice of Data Security Incident*, WebTPA, https://www.webtpa.com/notice (last visited May 21, 2024).

[2] *Id.*; *OCR Breach Portal*, U.S. Dep't of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited May 21, 2024).

8.      Although the Data Breach occurred in April of 2023, WebTPA did not detect the unauthorized activity until December 28, 2023.[3] WebTPA then delayed notifying impacted individuals until May 8, 2024—more than one year after the Data Breach occurred.[4]

9.      As described herein, Plaintiff's and Class Members' PII is now in the hands of cybercriminals as a direct and proximate result of WebTPA's failure to implement and follow basic security procedures.

10.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by WebTPA's failure to safeguard their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11.     As such, and on behalf of herself and all others similarly situated, Plaintiff brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in WebTPA's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## **PARTIES**

12.     Plaintiff Jessica Marcantel is an adult who at all relevant times is a resident and citizen of the State of Florida. Plaintiff received a Data Breach notice dated May 8, 2024, informing her that her PII in WebTPA's possession was compromised in the Data Breach.

13.     Defendant WebTPA Employer Services, LLC is a Texas limited liability company with its principal place of business located at 8500 Freeport Pkwy # 400, Irving, Texas 75063.

---

[3] *Notice*, *supra* note 1.
[4] *OCR Breach Portal*, *supra* note 2.

14.     Upon information and belief, WebTPA is a nine-member limited liability company. WebTPA's members include Charles Divta III, who upon information and belief is an adult and citizen of the State of Florida; Seth Van Essendelft, who upon information and belief is an adult and citizen of the State of Florida; Camille Harrison, who upon information and belief is an adult and citizen of the State of Florida; Michael J. McCabe, who upon information and belief is an adult and citizen of the State of Texas; Scott Case, who upon information and belief is an adult and citizen of the State of Texas, Dwight Mankin, who upon information and belief is an adult and citizen of the State of Texas; Joseph A. Pascullo, who upon information and belief is an adult and citizen of the State of Texas; Rachel Bechtel, who upon information and belief is an adult and citizen of the State of Texas; and Communitas Inc. who is a Texas corporation with a principal place of business located at 8500 Freeport Pkwy # 400, Irving, Texas 75063.

15.     Defendant WebTPA is a citizen of each state in which one of its members is a citizen. As such, WebTPA is a citizen of the State of Florida and the State of Texas.

16.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

17.     Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties when their identities become known.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

4

19.     This Court has personal jurisdiction over Defendant, as Defendant maintains its principal place of business in Irving, Texas and, at all relevant times, Defendant has engaged in substantial business activities in Texas, regularly conducts substantial business in Texas, and has sufficient minimum contacts in Texas.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

**A.     Defendant Provides Administrative Services Involving Highly Sensitive Data.**

21.     WebTPA is a third-party administrator that provides customized administrative services to health plans and insurance companies.[5]

22.     Since its founding in 1993, WebTPA has grown considerably and now has 2.7 million members under its administration.[6]

23.     WebTPA is a wholly owned subsidiary of GuideWell Mutual Holding Corporation, which employs over 18,000 individuals nationwide, earns over $26 billion in total revenue, and serves upwards of 46 million members.[7]

24.     In order to conduct its regular operations, WebTPA collects and stores a wide variety of PII including, *inter alia*, individuals' names, contact information, dates of birth, Social Security Numbers, and insurance information.

---

[5] Bill Toulas, *WebTPA Data Breach Impacts 2.4 Million Insurance Policyholders*, Bleeping Computer (May 17, 2024), https://www.bleepingcomputer.com/news/security/webtpa-data-breach-impacts-24-million-insurance-policyholders/.

[6] *A History of Innovative Service*, WebTPA, https://www.webtpa.com/webtpahistory (last accessed May 21, 2024).

[7] *Id.*

25.    Due to the sensitivity of the PII that WebTPA regularly handles, Defendant is aware of its critical responsibility to safeguard this information and, therefore, how devastating its theft is to individuals whose information has been stolen.

26.    In fact, WebTPA explicitly recognizes the importance of this responsibility, stating, "WebTPA is committed to protecting your privacy and the confidentiality of your personal information."[8]

27.    Despite this stated commitment to protecting Plaintiff's and Class Members' PII, WebTPA failed to prioritize data protection and cybersecurity by adopting reasonable data security measures to prevent (or, at least, to detect) the unauthorized access to Plaintiff's and Class Members' PII.

28.    Had WebTPA remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, WebTPA could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**B.    *The Data Breach*—Defendant Exposed Highly Sensitive PII to Nefarious Actors.**

29.    On December 28, 2023, WebTPA "detected evidence of suspicious activity on the WebTPA network." Upon investigation, WebTPA learned that an unauthorized bad actor had accessed Defendant's network between April 18 and April 23, 2023—approximately eight months before the Data Breach was ultimately detected.[9]

---

[8] *WebTPA Privacy Statement*, WebTPA (Dec. 1, 2020), https://www.webtpa.com/privacy.
[9] *Notice*, *supra* note 1.

30.     WebTPA's investigation further concluded that during the Data Breach, the bad actor may have obtained individuals' personal information. The PII obtained included individuals' names, contact information, Social Security Numbers, and insurance information.[10]

31.     Almost a year after the Data Breach, on March 25, 2024, WebTPA notified its client benefit plans and insurance companies of the Data Breach and the extent of the impacted data.[11]

32.     On May 8, 2024—more than a year after the Breach occurred—WebTPA finally began to report the Data Breach to impacted individuals and sent notice letters to Plaintiff and Class Members.[12]

33.     Many details about the Data Breach are still unknown. Neither the Notice nor any other information released by WebTPA addresses the manner in which cybercriminals were able to access WebTPA's systems, the identity of the hackers, whether a ransom was demanded and/or paid, why WebTAP failed to detect the Data Breach for months, why the notification was delayed, or what safeguards have been put in place to prevent similar incidents to Data Breach from occurring in the future.

34.     Although many specific details about the Data Breach (including the above) are still unknown, it is evident that bad actors accessed WebTPA's computer systems in an intentional attack designed to acquire individuals' valuable PII stored therein, and that the cybercriminals were successful in the attack.

35.     As a result of the Data Breach, the PII of approximately 2.5 million individuals— including Plaintiff and Class Members—was accessed, viewed, exfiltrated, and is now in the hands of cybercriminals.

---

[10] *Id.*
[11] *Id.*
[12] *OCR Breach Portal*, *supra* note 2.

**C.    The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice.**

36.    WebTPA was well aware that the protected PII it regularly acquires is highly sensitive and of significant value to those who seek to use it for wrongful purposes.

37.    WebTPA also knew that a breach of its computer systems, and exposure and exfiltration of the PII stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

38.    These risks are not theoretical, numerous high-profile breaches have occurred at companies in the healthcare sector, such as Anthem, Inc., American Medical Collection Agency, HCA Healthcare, Primera Blue Cross, Perry Johnson & Associates, and more.

39.    PII is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[13] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

40.    Further, criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

41.    The ramifications of WebTPA's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[13] *What To Know About Identity Theft*, Fed. Trade Comm'n Consumer Advice (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

42.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[14]

43.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[15]

44.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[16]

45.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some

---

[14] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf; *see also Identity Theft and Your Social Security Number*,  Social Security Admin. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[15] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[16] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 21, 2024).

form of identity fraud compared to 5.7 million people in 2021.[17]

46.    The healthcare industry has become a prime target for threat actors: "[h]igh demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[18]

47.    Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[19]

48.    In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[20]

49.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[21]

50.    Further, the types of PII stored by WebTPA and compromised in the Data Breach are particularly valuable to thieves and leave Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

---

[17] *Id.*

[18] *The healthcare industry is at risk*, SwivelSecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 21, 2024).

[19] *Id.*

[20] *2022 Breach Barometer*, Protenus, https://www.protenus.com/breach-barometer-report, (last visited May 21, 2024).

[21] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

51.    **Social Security Numbers—**Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

52.    The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[22]

53.    Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often, Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security

---

[22] *Identity Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

54.     **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[23]

55.     Even if stolen PII does not include financial or payment card information, that does not mean that there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

56.     Due to high-profile data breaches at other companies, WebTPA knew or should have known that its computer systems would be targeted by cybercriminals.

57.     WebTPA also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. WebTPA failed, however, to take adequate cybersecurity measures to prevent the Data Breach and release of its customers PII from occurring.

58.     The ramifications of WebTPA's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[23] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

**D.      Defendant Failed to Comply with FTC Guidelines.**

59.      WebTPA is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

60.      The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[24]

61.      In one guide, for example, the FTC recommends that all companies:

(a)      Identify all connections to the computers where sensitive information is stored;

(b)      Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

(c)      Not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

(d)      Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

(e)      Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

(f)      Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

---

[24] *Start with Security: A Guide for Business*, U.S. Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

(g)     Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

(h)     Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

(i)     Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

62.     The FTC further promulgated additional cybersecurity obligations for businesses

in a later guide, which include:

(a)     Conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

(b)     Encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

(c)     Crafting a data security plan that involves both physical security (e.g., locking up physical files) and electronic security, and training employees regarding the data security plan;

(d)     Promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

(e)     Developing a plan to handle a data breach or data security incident, if and when such an incident occurs. [25]

---

[25] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

63.     The FTC further recommends that companies verify that any third-party service providers have implemented reasonable security measures.[26]

64.     Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65.     Upon information and belief, WebTPA failed to properly implement one or more of the basic data security practices described above. WebTPA's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized release of Plaintiff's and Class Members PII to threat actor. Further, WebTPA's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

66.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[27]

---

[26] Erika Harrell, Bureau Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf. https://www.ssa.gov/pubs/EN-05-10064.pdf.
[27] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards and Technology (April 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

67.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[28] Upon information and belief, WebTPA failed to adhere to the NIST guidance.

68.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare industry, including implementing the following measures:

(a)     Email protection systems and controls;

(b)     Endpoint protection systems;

(c)     Identify all users and audit their access to data, application, systems, and endpoints;

(d)     Data protection and loss prevention measures;

(e)     IT asset management;

(f)     Network management;

(g)     Vulnerability management;

(h)     Security operations center & incident response; and

(i)     Cybersecurity oversight and governance policies, procedures, and processes.[29]

---

[28] *Id.* at Table 2 pg. 26-43.
[29] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last accessed May 21, 2024).

69.     Upon Information and belief, WebTPA's failure to protect Plaintiff's and Class Members' PII is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

70.     WebTPA was, at all times, fully aware of its obligation to protect the PII Plaintiff and Class Members because of its business model of collecting and storing PII. WebTPA was also aware of the significant repercussions that would result—and have already resulted—from their failure to do so. Despite understanding the risk and consequences of inadequate data security, WebTPA nevertheless failed to comply with its data security obligations.

**E.    Plaintiff's Experience.**

71.     WebTPA provides administrative services to Plaintiff's benefit plan and/or insurance company. In the course of providing those administrative services, WebTPA was entrusted with Plaintiff's PII.

72.     Plaintiff received a Data Breach Notice from WebTPA on May 8, 2024, informing her that her PII in Defendant's possession was compromised in the Data Breach. The Notice but the onus on Plaintiff to protect her PII by encouraging her to remain vigilant, recommending that she regularly review her credit reports and Explanation of Benefits from her benefit plan for suspicious activity and report any suspicious or unrecognized activity immediately.

73.     Since learning of the Data Breach, Plaintiff has been required to spend his valuable time and efforts to mitigate her risk of identify theft and fraud, including spending time researching the Data Breach, and spending time to monitor her various financial and medical accounts.

74.     Since the Data Breach, Plaintiff has also received a dark web monitoring alert from her credit monitoring services, alerting her that her PII is on the dark web.

75.     Plaintiff has suffered actual injury from having her PII exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor

her financial and medical accounts to ensure her information is not used for identity theft and fraud; (2) damages to and diminution of the value of her PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (3) loss of privacy.

76.    In addition, knowing that bad actors accessed and likely exfiltrated her PII and this information likely has been and will be sued in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

77.    As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heighted risk for fraud and identify theft and their attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

**F.    Plaintiff and Class Members Suffered Damages.**

78.    The ramifications of WebTPA's failure to keep consumers' PII secure are long-lasting and severe. WebTPA's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

79.     In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[30] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like WebTPA's, are both time-consuming and of only limited and short-term effectiveness.

80.     The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

81.     Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

82.     It must also be noted there may be a substantial time lag—measured in years— between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting

---

[30] Government Accountability Off., *Data Breaches* (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf.
[31] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited May 21, 2024).

from data breaches cannot necessarily rule out all future harm.[32]

83.    For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of WebTPA's conduct.

84.    Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use it and trade the information on the cyber black market for years thereafter.[33]

85.    The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

86.    Plaintiff and Class Members are also at a continued risk because their information remains in WebTPA's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as WebTPA fails to undertake the necessary and appropriate security and training measures to protect its customers' PII.

87.    As a result of WebTPA's failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

88.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

---

[32] *See* 2007 GAO Report, at 29. https://www.gao.gov/assets/gao-07-737.pdf (last visited May 21, 2024).
[33] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

## CLASS ALLEGATIONS

89.     Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States and its territories whose PII was compromised in the WebTPA Data Breach which occurred between April 18, 2023, and April 23, 2023 (the "Class").

90.     Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

91.     Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

92.     **Numerosity.** Plaintiff is informed and believes, and thereon alleges, that there are, at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through WebTPA's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 2.5 million individuals.

93.     **Commonality.** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

(a)     Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

(b)     Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII;

21

(c)    Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

(d)    Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

(e)    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

(f)    Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;

(g)    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(h)    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

(i)    Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

(j)    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

94.    **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently obtained by an unauthorized third party.

95.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel that is competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

96.    **Superiority.** Class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class Member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit financial institutions to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

97.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, WebTPA's liability and the fact of damages is common to Plaintiff and each member of the Class. If WebTPA breached its duties, then Plaintiff and each Class Member suffered damages by that conduct.

98.    **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

99.    **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through WebTPA's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

100.     Plaintiff restates and realleges the allegations set forth in paragraphs 1-99 above as if fully set forth herein.

101.     WebTPA owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

102.     Specifically, this duty included, among other things: (a) designing, maintaining, and testing WebTPA's security systems to ensure that Plaintiff's and Class Members' PII in WebTPA's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

103.     WebTPA's duty to use reasonable care arose from several sources, including but not limited to those described below.

104.     WebTPA had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, WebTPA was obligated to act with reasonable care to protect against these foreseeable threats. Furthermore, WebTPA knew or should have known that, if hackers accessed the sensitive data contained in its data systems, the responsibility for remediating and mitigating the consequences of the Data Breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and

the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendant's unsecured, unreasonable data security measures.

105.    Additionally, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

106.    WebTPA breached the duties owed to Plaintiff and Class Members and thus was negligent. WebTPA breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) promptly disclose that Plaintiff's and Class Members' PII in WebTPA's possession had been or was reasonably believed to have been, stolen or compromised.

107.    But for WebTPA's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

108.    As a direct and proximate result of WebTPA's negligence, Plaintiff and Class Members have suffered injuries including:

(a)    Theft of their PII;

(b)    Costs associated with requesting credit freezes;

(c)    Costs associated with the detection and prevention of identity theft;

(d)    Costs associated with purchasing credit monitoring and identity theft protection services;

(e)    Lowered credit scores resulting from credit inquiries following fraudulent activities;

(f)    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

(g)    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

(h)    Damages to and diminution in value of their PII entrusted to WebTPA with the mutual understanding that WebTPA would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

(i)    Continued risk of exposure to hackers and thieves of their PII, which remains in WebTPA's possession and is subject to further breaches so long as WebTPA fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

109.    As a direct and proximate result of WebTPA's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

110.    Plaintiff restates and realleges all the allegations set forth in paragraphs 1-99 above as if fully set forth herein.

111.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as

WebTPA for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of WebTPA's duty.

112.    WebTPA violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. WebTPA's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

113.    Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

114.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

115.    WebTPA's violation of Section 5 of the FTC Act constituted negligence *per se.*

116.    As a direct and proximate result of WebTPA's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 108 above.

117.    As a direct and proximate result of WebTPA's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

118.    Plaintiff restates and realleges the allegations set forth in paragraphs 1-99 above as if fully set forth herein.

119.    By engaging in the conduct described in this Complaint, WebTPA has knowingly obtained and derived benefits from Plaintiff and Class Members at Plaintiff's and Class Members'

expense, namely the profits gained from payment in exchange for the use of WebTPA's services, such that it would be inequitable and unjust for Defendant to retain.

120.    By engaging in the acts and failures to act described in this Complaint, WebTPA has been knowingly enriched by the savings in costs that should have been reasonably expensed to protect the PII of Plaintiff and the Class. Defendant knew or should that known that theft of consumer PII could happen, yet it failed to take reasonable steps to pay for the level of security required to have prevented the theft of its consumers' PII.

121.    WebTPA's failure to direct profits derived from Plaintiff's and Class Members' payments for services toward safeguarding Plaintiff's and Class Members' PII constitutes the inequitable retention of a benefit without payment for its value.

122.    WebTPA will be unjustly enriched if it is permitted to retain the benefits derived after the theft of Plaintiff's and Class Members' PII.

123.    Plaintiff and Class Members have no adequate remedy at law.

124.     As a direct and proximate result of WebTPA's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

125.    WebTPA should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

126.    Plaintiff restates and realleges the allegations set forth in paragraphs 1-99 above as if fully set forth herein.

127.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

128.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether WebTPA is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

129.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    (a)    WebTPA owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law and Section 5 of the FTC Act; and

    (b)    WebTPA continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

130.    This Court also should issue corresponding prospective injunctive relief requiring WebTPA to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

131.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at WebTPA. The risk of another such breach is real, immediate, and substantial. If another breach at WebTPA occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

132.     The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to WebTPA if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to WebTPA of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and WebTPA has a pre-existing legal obligation to employ such measures.

133.     Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at WebTPA, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.     For damages in an amount to be determined by the trier of fact;

D.     For an order of restitution and all other forms of equitable monetary relief;

E.     Declaratory and injunctive relief as described herein;

F.     Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

G.     Awarding pre- and post-judgment interest on any amounts awarded; and

H.     Awarding such other and further relief as may be just and proper.

### JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: May 22, 2024                    Respectfully submitted,

                                       **Law Offices of**
                                       **LIPPE & ASSOCIATES**

                                       /s/ Emil Lippe, Jr.
                                       Emil Lippe, Jr.
                                       State Bar No. 12398300
                                       Park Place at Turtle Creek
                                       2911 Turtle Creek Blvd., Suite 1250
                                       Dallas, Texas 75219
                                       Tel. (214) 855-1850
                                       Fax. (214) 720-6075
                                       emil@texaslaw.com

                                       Gary F. Lynch*
                                       Nicholas A. Colella*
                                       Patrick D. Donathen*
                                       Connor P. Hayes*
                                       **LYNCH CARPENTER LLP**
                                       1133 Penn Avenue, 5th Floor
                                       Pittsburgh, PA 15222
                                       Telephone: (412) 322-9243
                                       gary@lcllp.com
                                       nickc@lcllp.com
                                       patrick@lcllp.com
                                       connorh@lcllp.com

                                       *pro hac vice forthcoming*

                                       *Attorneys for Plaintiff and the Proposed Class*